### THE DEVONA.

(District Court, D. Maine, S. D. November 29, 1922.)

Nos. 572–574.

1. **Shipping ⊗═86(2)—Evidence held to show that hatch fore-and-after was defective.**

   As respects liability of vessel for accident caused by hatch giving way and precipitating stevedores into the hold, evidence *held* to show that hatch fore-and-after was defective, and that its defective condition contributed to injury.

2. **Shipping ⊗═86(2)—Stevedores held not free from fault in standing on hatch section when another section was removed.**

   As respects liability of vessel for accident caused by hatch giving way and precipitating stevedores into the hold, evidence *held* to show injured stevedores were not free from fault contributing to the injury in standing on the after section of the hatch when a winch was pulling out a fore-and-after of another section.

⊗═For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**3. Shipping ⟨⇒⟩86(3)—Where negligence of stevedores concurs with that of ship, damages divided.**

Where both the ship and injured stevedores were in substantial fault contributing to the injury, damages must be divided.

In Admiralty. Libels by Michael Kane against the steamship Devona, by Luca Farinelli, against the steamship Devona and the Convoy Steamship Company, Limited, and by Patrick J. Joyce, administrator, against the Convoy Steamship Company, Limited. Decree for libelants.

Joseph E. F. Connolly and Richard E. Harvey, both of Portland, Me., for libelant in No. 572.

J. H. McCann, of Portland, Me., for libelant in No. 573.

N. W. Thompson and William A. Connellan, both of Portland, Me., for libelant in No. 574.

William H. Gulliver, of Portland, Me., for claimants.

HALE, District Judge. The steamship Devona is an iron ship, of British ownership, of the burden of about 8,000 tons, and at the time complained of in the libels was engaged in the business of ocean freight transportation. She sailed in ballast from Cardiff, Wales, November 5, 1919, arrived in Portland, Me., on November 30, 1919, and docked, on the morning following, alongside a wharf of the Grand Trunk Railway Company. At that time all of her hatches were in place and covered in the usual manner by tarpaulins. The hatches on the ship are 19 feet 11 inches long and 15 feet wide separated by two steel thwartship beams, running across, and fitting into slots on the inside of the coaming of each hatch. Connecting these two thwartship beams at their centers are three fore-and-afters of wood, resting in sockets riveted on the steel thwartship pieces and the coaming; resting on these fore-and-afters are the hatch covers of 2½-inch plank, 8 to 9 feet in length, and weighing between 70 and 100 pounds each. The fore-and-afters are about 8 inches square, estimated to weigh about 100 pounds each.

During the day after the arrival of the ship a crew of independently contracting longshoremen went to work on the ship, to prepare her for loading and to load her. The crew was divided into two gangs. The first gang removed the hatch covers from No. 2 hatch and commenced the loading of the cargo. Late in the afternoon the other gang stopped their work in the hold, leaving the first gang to put back the covers for the night, which they did.

On the following morning, December 2, 1919, the crew of stevedores came aboard the ship. One man was stationed to run the winch, and others to remove the hatch covers and hatch beams. Some of the stevedores were on the after hatch, while the winch was being operated in the removal of the fore-and-afters. They had removed the hatch covers from the forward section and the second section, and were standing on the third section of the hatch aft. To the winch was attached the tackle and fall used in lifting the fore-and-afters out of position. When the second fore-and-after was being taken out by the

winch and fall, the after section of the hatch, on which several stevedores were standing, fell into the hold of the vessel, precipitating three of them with it into the hold. Two of the stevedores were injured, and one lost his life.

The libels are brought to recover injuries alleged to have been suffered by the stevedores by reason of the negligence of the ship in not providing safe and suitable instrumentalities with which the stevedores were to work, and especially in furnishing a fore-and-after unsafe and unfitted for the use to which it was applied, and which, by reason of its defective condition, fell from its sockets into the hold, carrying with it the hatch covers and the men standing thereon while engaged in their work, and causing the injuries and death set forth in the libels.

In No. 572, Michael Kane brings his libel against the ship. In No. 573, Luca Farinelli brings his libel against the ship and the Convoy Steamship Company, Limited (the shipowner). In No. 574, Patrick J. Joyce, administrator of Michael J. Joyce, deceased, brings his libel against the Convoy Steamship Company, Limited (the shipowner), alleging that his intestate came to his death by reason of the negligence of the ship and the shipowner.

Two questions of fact are involved: First. Does the testimony show that the ship failed in its duty of supplying safe and suitable appliances for the use of the longshoremen while they were at work on the ship; and that the accident happened by reason of such failure in its duty? Second. Were the stevedores themselves guilty of negligence which contributed to the injury?

[1] 1. The libelants offer testimony tending to show that the fore-and-afters furnished by the ship were chewed, worn, and rounded, so that they were much shorter on the bottom, as they lay in their sockets, than they were on top, making a difference between the bottom of the fore-and-afters and the spaces which they had to fill of about 1¾ inches; that, in some cases, the sockets in which the fore-and-afters were to be placed were loose, so that the resting surface of each fore-and-after sagged down, instead of being at a level and at right angles to the socket; that the fore-and-afters were shorter than the spaces which they were intended to fill, and that thus the whole hatch was made a menace to the safety of men working there.

It appears from the testimony that the three fore-and-afters were marked as follows: The aft fore-and-after was marked A (standing for aft), the middle fore-and-after was marked M, and the forward fore-and-after marked F.

Without considering the other proofs of negligence offered by the libelant, there is much evidence that the fore-and-after A was, at the ends, rounded, worn, chewed, and shorter on the bottom as it stood in its sockets than it was on top; so that the resting surface sagged down from the socket.

The ship has offered testimony, on the other hand, that the fore-and-after in question had been used for a time before, and has been used since the accident, and was in a reasonably safe and suitable condition; that the injury resulted, not from any defect in the fore-and-after itself, but from a misplacement of the fore-and-afters by the stevedores

themselves, for which misplacement the ship was not responsible; that the aft fore-and-after A was 6 feet long; that the forward fore-and-after F was 5 feet 10 inches long; that, on the evening before the accident, these fore-and-afters were misplaced, A being put in the forward position in the place of F, and F, the shorter one, being put aft in the place of A; that the result was that the longer fore-and-after A crowded the space for which F was intended, and made the middle fore-and-after fit too tightly into its place, so that it had to be pounded in; that F, the shorter fore-and-after, being placed to fit in place of A, was long enough to retain its place until M was removed with some force—"jerked out" as the claimant says—and that, when so removed, the shorter fore-and-after F fell into the hold, causing the deplorable accident. The fore-and-afters were frankly produced by the ship and brought into court, were examined carefully by me, and were the subject of examination and cross-examination by the several proctors.

It is true, as urged by the learned proctor for the ship, that the fore-and-afters, in order to perform the functions for which they were intended, must be somewhat loose, so that there can be proper play in their operation.

I have examined the proofs relating to the ship's negligence. At the hearing I requested the proctors for the libelants and the ship to restate the evidence on this vital point, and especially as to the condition and location of the fore-and-after A at the time of the injury.

The testimony in behalf of the ship presented a measurement of the three fore-and-afters and a complete tabulation of measurements, upon a blueprint. I found this tabulation of value in the consideration of the case.

It is unnecessary to refer to all the proofs on this point. The positive testimony of the boss, Vanier, is important. He seemed to be fair and honest and in a position to know the things of which he testified. He says that, after the fore-and-after which went into the hold was taken out, he himself "looked to see if they had the right fore-and-after on." He "took up the fore-and-after that went into the hold." He says he observed that it was marked A. Although there is a sharp conflict on this point, I think the preponderance of evidence is that A was the fore-and-after which fell. On examining the fore-and-after-A, and upon all the evidence in regard to it I am of the opinion that its rounded and worn condition at one of its ends made it on the whole unsuitable and dangerous for the use for which it was intended.

I am constrained to find that it was not in such condition as to have been properly used in the reasonable and prudent conduct of its affairs by the ship.

The decision of this question is not free from difficulties; but the estimony brings me to the conclusion that the libelants have met the burden of showing, by a preponderance of evidence, that the fore-and-after A was defective, that its defective condition contributed to the injury, and that the ship failed in a duty which it owed to the injured longshoremen.

[2] 2. Were Kane, Farinelli, and Joyce also at fault? Were they guilty of negligence which contributed to the injury?

The whole testimony makes it clear to me that they were not free from fault in standing upon the after section when the winch was pulling out No. 2 fore-and-after. I am not satisfied from the evidence that they were compelled to remain upon the hatch covers while the No. 2 fore-and-after was being pulled out. If any of them were required to adjust the tackle around No. 2 fore-and-after, they might readily have withdrawn before the winch made the pull. It is not necessary to decide how much of a jerk had to be applied to the fore-and-after in question in order to get it out. A fair consideration of the proofs leads me to the conclusion that it was driven in hard, and that some force was required to remove it. Even though the unfortunate victims of the disaster did not know that the fore-and-after upon which they were relying for their support, while they stood upon the after hatch, was defective, they must be held to the care of reasonably prudent men under all the circumstances of the case. While they were upon the after hatch and saw the winch at work upon the structure, or, if prudent observers, might have seen it, the testimony shows that the danger was apparent, or would have been apparent to reasonably prudent men, that, when the winch applied some force to the No. 2 fore-and-after, a shaking of the whole structure would result. I am satisfied that there must always be some risk in standing upon one portion of the hatches while another portion is being pulled out by a winch.

The testimony convinces me that the men were not paying the attention which reasonably prudent men would pay, under all the circumstances of the case; that they were not giving proper heed to the act of the winchman. The boss, Breen, testifies that, in taking off the hatches, men are always in a hurry and "never look at the winch driver."

In The Max Morris (D. C.) 24 Fed. 860, 862, affirmed by the United States Supreme Court, 137 U. S. 1, 11 Sup. Ct. 29, 34 L. Ed. 586, Judge Addison Brown said:

"It is impossible to absolve landsmen, accustomed to work upon vessels in port, from reasonable care and attention to their movements about vessels with which they are unacquainted."

In State of Maryland, to Use of Dombroska et al., v. Westoll et al. (D. C.) 106 Fed. 233, the court was acting upon a case where "the fittings of the ship, supplied by the owner, were proper and were kept in proper repair, but where in using them they were not assembled together as originally intended." Judge Morris said:

"It may be conceded that if, by such neglect or misuse by the servants of the owners, or under the direction of those who represented him, the hatch covers did not bear the usual weight to be expected of them, and a person lawfully standing on them, without warning, fell through, then the owner would be liable. This case, however, presents other considerations. This was a large opening, the covers of which were sustained by a framework of heavy beams and rods made so as to be readily taken apart or assembled together, and necessarily constructed so that when all were fitted together every part helped to sustain and keep in place every other part. It was this structure which the stevedores were engaged in taking apart with the aid of the power

285 F.—12

of the steam winch. The testimony for the respondents in this case shows that there is always risk in a man standing upon one portion of such a structure when the other portions are being pulled out by a winch, and some contracting stevedores testify that they do not allow their men ever to do it if they see them. Undoubtedly it is done, but it is known to be attended with danger; and in a recent case of a quite similar accident I held upon the testimony then before me that it was negligence in a seaman to do this very same thing. The danger is so obvious that it scarcely needs explanation from persons having special knowledge."

This Dombroska Case shows a very similar case of negligence to that in the case at bar; but in that case the evidence did not disclose, and the court did not find, any fault on the part of the ship. See, also, the following cases, where there was a similar fault on the part of the stevedores, but where evidence did not disclose fault on the part of the ship: The Aldborough (D. C.) 106 Fed. 90; McDonnell v. Oceanic Steam Navigation Co., Ltd., 143 Fed. 480, 483, 74 C. C. A. 500; The Esperanza De Larrinaga, 248 Fed. 489, 160 C. C. A. 499.

In the case at bar, under all the testimony in the case, it must be held that the injured men were clearly at fault. Although it cannot be said that they were guilty of gross or willful negligence, they were guilty of such negligence as clearly contributed to the injury.

Having thus found with reference to the fault of the injured men, it is not necessary to refer to any other element of negligence involved in their case.

[3] 3. I have found both the ship and the injured men to have been in substantial fault contributing to the injury.

The result is that damages must be divided. The case presents a case of negligence of the stevedores, concurring with negligence on the part of the ship. The Max Morris, supra, is an authoritative statement, by the United States Supreme Court, of the law in such cases. In speaking for the court in that case, Mr. Justice Blatchford commented upon the fact that the admiralty cases—

"show an amelioration of the common-law rule, and an extension of the admiralty rule in a direction which I think is manifestly just and proper. Contributory negligence * * * should not wholly bar recovery. There would have been no injury to the libelant but for the fault of the vessel; and while, on the one hand, the court ought not to give him full compensation for his injury, where he himself was partly in fault, it ought not, on the other hand, to be restrained from saying that the fact of his negligence should not deprive him of all recovery of damages. * * * The mere fact of the negligence of the libelant as partly occasioning the injuries to him, when they also occurred partly through the negligence of the officers of the vessel, does not debar him entirely from a recovery."

And the Supreme Court sustained the action of Judge Brown, a master mind in applying admiralty law to the facts in any maritime case.

In The Wanderer, 20 Fed. 140, one of the pioneer cases on this point, Judge Pardee, in the old Circuit Court, held that courts will, in the exercise of sound discretion, award damages according to the principles of equity and justice, considering all the circumstances of the case, and will divide damages in case of a substantial fault upon both sides.

In the case before me the necessary conclusion is that the libelants are entitled to a decree for divided damages. The case is referred to Thomas L. Talbot, Esq., and Albert B. Hall, Esq., assessors. Upon the coming in of the assessors' report, I will take such further action as the case may require.